## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MICHAEL SMITH,        ) | |
|        ) | |
| Plaintiff,        ) | |
|        ) | |
| vs.        ) | Case No. 3:15-cv-770-NJR-DGW |
|        ) | |
| KIMBERLY BUTLER, JEANETTE        ) | |
| HECHT, KENT BROOKMAN, LORI        ) | |
| OAKLEY, and BILLIE W. GREER,        ) | |
|        ) | |
| Defendants.        ) | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Now pending before the Court is the motion for summary judgment filed by Defendants on July 27, 2017 (Doc. 88). For the reasons set forth below, the motion is granted in part and denied in part.

### INTRODUCTION

Plaintiff Michael Smith, an inmate currently incarcerated at Menard Correctional Center, filed a third amended complaint pursuant to 42 U.S.C. § 1983 on February 16, 2016 (Doc. 28). Smith alleges his constitutional rights were violated when he was retaliated against for First Amendment activity (Count I) and that his due process rights were violated during a disciplinary proceeding at Menard in November 2014 (Count II).

Defendants now seek summary judgment on the merits of Smith's claims (Doc. 88). Smith responded to the motion on August 8, 2017 (Doc. 92). In his response, Smith states that he requires additional discovery. As explained below, Smith's request

is denied in that he has failed to show, by affidavit, that he cannot present facts essential to opposing summary judgment, as required by Federal Rule of Civil Procedure 56(d).

**BACKGROUND**

In October 2013, Smith began writing letters to the John Howard Association[1] after a representative from that organization toured Menard (Doc. 89-1, pp. 16-7). Smith communicated with the organization about two to three times a month if there "wasn't any immediate incidents that affected me directly." (*Id.* at p. 17). His letters would include "observations [he] noticed throughout the weeks." (*Id.*). Smith testified that prison staff knew of his correspondence with the John Howard Association because, after routine cell searches called shakedowns, his envelopes would be opened with the contents spread out on the floor and his bed (*Id.* at p. 18).

Smith testified that officers began retaliating against him for corresponding with the John Howard Association beginning in 2013 with "little shows of harassment here and there." For example, Smith would return to his cell to find his bedding in the toilet, his personal property and documents gone, and wet spots and foot stains on his mattress and sheets (Doc. 89-1, p. 88). There is no evidence, however, that any named Defendant had actual knowledge of the contents of these letters.

According to Smith, the retaliation escalated in April 2014. At this time, Smith was under investigation for being the gang chief for the Latin Folks and the Maniac Latin Disciples in North 1 Cell House (*Id.* at pp. 38, 42). Smith claims the prison labeled him a

---

[1] According to its website, this organization "independently monitors correctional facilities, policies and practices, and advances reforms needed to achieve a fair, humane and effective criminal justice system in Illinois." THE JOHN HOWARD ASSOCIATION, http://www.thejha.org (last visited Nov. 29, 2017).

gang chief in order to justify officers' actions that would otherwise have violated prison policies. For example, his cell was shaken down more than once in a 30-day period, which, he asserts, is normally contrary to prison regulations (*Id.* at p. 37). On both April 2, 2014, and April 5, 2014, Smith's cell was shaken-down, he was strip-searched, and he was interviewed for more than two hours (*Id.* at pp. 89-91). Smith asserts that Defendant Kimberly Butler, the Warden, was present during these shakedowns. He also believes Defendant Jeanette Hecht, an intelligence officer, was present—though he also testified his head was down (*Id.* at pp. 92-93). Smith alleges that the shakedowns occurred in retaliation for his communication with the John Howard Association. After the second shakedown, Smith says an investigating officer asked him about "mail that was discovered from April 2nd." (*Id.* at 93). Smith also admits, however, that he was informed during the first interview that the shakedown was for investigative purposes (*Id.* at p. 93).

On October 17, 2014, Smith was interviewed by Correctional Officer M. Hof, who placed Smith on investigative status "for the safety and security of the institution." (Doc. 92-2, p. 16). Defendant Hecht had received information from confidential informants that Smith was involved in a gang and was conspiring to direct an attack on prison staff (Doc. 92-2, p. 14; Doc. 89-3, p. 3). Smith was moved from the North 1 general population unit and placed on 7 Gallery in the North 2 segregation unit (Doc. 89-1, p. 47).

Also on October 17, 2014, Smith filed an emergency grievance regarding the interview that occurred that day, his placement on investigative status, and the

destruction or loss of his personal property during his placement on investigative status. Smith sought to return to general population (*Id.* at pp. 18-19). While an emergency grievance is usually sent directly to the Warden, Smith's emergency grievance was responded to by Brad Bramlet, Smith's grievance counselor, on October 21, 2014 (*Id.*). Smith resubmitted the grievance, again as an emergency. On October 24, 2014, Warden Butler responded and indicated the grievance was not an emergency (Doc. 92-2 at p. 10). Counselor Bramlet responded to the grievance on November 14, 2014, stating that "[p]lacement is an administrative decision and is done for the safety and security of the institution." (*Id.*).

On Sunday, November 16, 2014, Smith was moved to cell 718 in North 2 (*Id.* at p. 43). Smith asserts that this move was retaliatory because, sometime between November 9 and November 15, a representative from the John Howard Association visited Menard for a tour and was escorted by Warden Butler and others (*Id.* at pp. 30-31, 99). When they got to Smith's cell, Smith "inquired" about his investigative status within the hearing of the Warden (*Id.* at pp. 31-32). Smith claims the cell he was moved to on November 16 had a broken toilet, no hot water, no blanket, no working fan, and none of his electronics or personal property (*Id.* at pp. 97, 105-06). When Smith entered the cell, he noticed the toilet didn't work and informed the gallery officer who said that a plumber would be summoned (*Id.* at p. 98). No plumber arrived for the week or week and a half he was housed there (*Id.* at p. 99).

Smith testified that Officer Hecht and Warden Butler must have orchestrated his move to a cell with a broken toilet and no hot water because "placement doesn't have the

authority" to move offenders on the weekend without "prior approval" from Internal Affairs or the Warden (*Id*. at p. 99, 100). While Smith was unsure whether Defendants knew the cell lacked a functioning toilet before he was placed there (*Id*. at p. 101), they failed to correct the conditions after he wrote informal letters and formal grievances addressed specifically to Defendants (*Id*. at p. 102).

On November 17, 2014, Defendant Hecht signed a disciplinary report charging Smith with conspiracy to assault any person and security threat group (i.e., gang) activity (Doc. 92-2, p. 14). The report was served upon Smith the following day (*Id*.). Specifically, the report stated that Smith acted in the capacity of the Latin Folks North 1 Unit Coordinator to order an assault on Menard security staff in the North 1 cell house. Upon signing the report, Smith requested that three witnesses be called at his disciplinary hearing: inmate Sanford/Stanford, inmate Raul Fernandez (with whom he allegedly conspired), and Correctional Officer Hof (*Id*.).

The Adjustment Committee held a hearing on the disciplinary report on November 20, 2014 (Doc. 92-2, p. 12; Doc. 89-1, p. 54). As soon as Smith walked into the hearing room, Defendant Kent Brookman told Smith he was getting a year in segregation (Doc. 89-1, p. 55). Smith nonetheless pleaded not guilty and provided a written statement at the hearing (along with his October 17, 2014 grievance). In the statement, Smith claimed there were technical problems with the disciplinary report and investigation (Doc. 92-2, p. 15). Specifically, Smith asserted that his 30-day investigative status ended on November 16, 2014, with no disciplinary report issued (*Id*.). Thus, the disciplinary report dated November 17, 2014, was untimely. He further stated that he

only knew Fernandez and Sanford/Stanford in passing and that he was not guilty of the charged offenses (Doc. 92-2, p. 15). He repeated those claims verbally to the Adjustment Committee (Doc. 89-1, p. 55-6). The Adjustment Committee acknowledged his written statement and heard testimony from two witnesses, inmate Fernandez and Officer Hof (Doc. 89-3, p. 5). Fernandez simply stated he knew nothing, and Hof stated that the disciplinary report was accurate (*Id.*). Defendant Brookman told Smith that the testimony of Sanford/Stanford was unnecessary because there was sufficient evidence to find him guilty (Doc. 89-1, p. 58).

The Adjustment Committee, comprised of Defendant Brookman and Jason Hart, who is not a defendant in this case, issued a final summary report on November 20, 2014. The report found Smith guilty of both conspiracy to assault and gang activity, based on the information Defendant Hecht received from the confidential informants (Doc. 89-3, pp. 5-6). Smith was sentenced to one year segregation, one year of C Grade, one year of commissary restrictions, and six months of contact visit restrictions (*Id.*).[2]

On November 24, 2014, Smith was moved from cell 718 to cell 628 in North 2 (Doc. 89-1, p. 42; Doc. 89-2, ¶ 14). Smith contends this move was also done in retaliation. The cell was dark, cold, and had a metal door with only one small opening. Smith claims he was without his property and without a blanket (*Id.* at p. 104). He also was not allowed any yard time for five to six months from November 2014 to May 2015 (*Id.* at p. 109). Smith claims this period of time was unrelated to the discipline imposed by the Adjustment Committee.

---

[2] Warden Butler signed off on the decision on November 25, 2014, and Smith was served with the final report on December 3, 2014 (*Id.* at p. 6).

Smith wrote grievances on November 17, 18, and 20, 2014, and December 4, 2014, related to his cell conditions and the Adjustment Committee hearing (Doc. 89-1, pp. 22, 61). Smith placed these grievances in the bars of his cell to be picked up by a correctional officer, but he did not receive responses from the prison (*Id*. at pp. 25, 28, 29, 62). As to the November 17 grievance, Smith also "notified" the Adjustment Committee, Defendant Hecht, and prison "staff," as well as the state public defender and the John Howard Association (*Id*. at pp. 25-26). He also informed the John Howard Association and his attorneys of November 18 grievance (*Id*. at pp. 25, 28). After receiving no responses to his November 17, 18, and 20, 2014 grievances, Smith made a duplicate of his next grievance, dated December 4, 2014. He submitted one internally at Menard and another to the Administrative Review Board ("ARB"). (*Id.* at p. 62). Smith received a response from Defendant Billie Greer at the ARB, asking Smith to provide the grievance officer and Warden's response to his grievance (*Id*. at pp. 63-64). Smith refiled that grievance through the normal institutional channels on February 6, 2015, but received no responses (*Id*. at pp. 64-65).

On January 6, 2015, Smith filed a grievance complaining about the Adjustment Committee hearing and the untimeliness of his disciplinary ticket.[3] Grievance Officer Lori Oakley responded to this grievance and the October 17, 2014 grievance on March 3, 2015 (Doc. 92-2 at p. 4). Oakley recommended that the grievances be denied, and Warden Butler concurred on March 5, 2015 (*Id*.). Smith appealed to the ARB on March 9,

---

[3] The reproduction of the January 6, 2015 grievance by both Plaintiff and Defendants is largely unreadable (Docs. 89-3, pp. 12-13; Doc. 92-2, pp. 6-7). There does not appear, however, to be any dispute as to the contents.

2015 (*Id.*). The ARB (through Defendant Greer) concurred with the institution's response to the grievance that no violations of any regulations occurred (*Id.* at p. 3).[4]

Smith submitted additional grievances on March 9, 2015, March 30, 2015, March 31, 2015, October 16, 2015, and December 16, 2015 (*Id.* at pp. 68, 82, 85). These grievances concerned or touched upon the disciplinary proceedings. Smith testified that he received a response to the March 9, 2015 grievance from Billie Greer at the ARB, dated May 5, 2015, stating: "The grievance was not submitted in the time frame outlined in Department Rule 504. Further, this office has previously addressed this issue on March 31, 2015. No justification provided for additional consideration." (*Id.* at pp. 68-69). He also received an institutional response, signed by an unknown grievance officer, denying the grievance (*Id.* at pp. 69-70). Smith testified that he received responses to remaining grievances, either from the institution or the ARB, but he generally could not recall who specifically responded or what the response said (*Id.* at pp. 68-86). The record does not contain copies of these grievances or any responses. Smith believes that Defendant Butler and Defendant Hecht played some role in the fact that none of his other grievances "made it through the chain of command." (*Id.*).

### LEGAL STANDARD

Summary judgment is proper only if the moving party can demonstrate "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005);

---

[4] The Director of the IDOC concurred with a signature ("D. Stolworthy"), handwritten initials "TA," and a handwritten date of April 9, 2015.

*Black Agents & Brokers Agency, Inc. v. Near North Ins. Brokerage, Inc.*, 409 F.3d 833, 836 (7th Cir. 2005). The moving party bears the burden of establishing that no material facts are in genuine dispute; any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *Lawrence v. Kenosha Cty.*, 391 F.3d 837, 841 (7th Cir. 2004).

A moving party is entitled to judgment as a matter of law where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* The Seventh Circuit has stated that summary judgment is "the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (other citations omitted)).

D<span style="font-variant:small-caps">ISCUSSION</span>

## I.    Retaliation

In Count I, Smith claims Defendants Butler and Hecht retaliated against him for writing to the John Howard Association and for writing grievances by ordering the April 2014 shakedowns of his cell, labeling him a gang chief, placing him in investigative status on October 17, 2014, issuing him a defective disciplinary ticket, moving him into cells without basic necessities, and making sure his grievances did not make it through the chain of command. Defendants argue they are entitled to summary judgment on

Smith's claim because there is a complete lack of evidence of a causal connection between Defendants' alleged actions and Smith's protected First Amendment activity. Defendants further argue that Smith cannot rely solely on the timing of events to support his retaliation claim and that Smith cannot prove the alleged retaliatory conduct deterred him from pursuing any First Amendment activity.

"An act taken in retaliation for the exercise of a constitutionally protected right violates the Constitution." *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000). A plaintiff has a First Amendment right to file grievances and lawsuits. *Id.*; *Watkins v. Kasper*, 599 F.3d 791, 798 (7th Cir. 2010). In order to prevail on a claim of retaliation, a plaintiff must first show that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." *Hawkins v. Mitchell*, 756 F.3d 983, 996 (7th Cir. 2014) (citations omitted). The plaintiff must set forth a chronology of events and show that his litigation activities were a motivating factor for an adverse action. *DeWalt*, 224 F.3d at 618. In this context, an adverse action is one that would chill or deter a person from exercising a First Amendment right. *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982). Once the plaintiff meets his burden, the burden shifts to the defendants to show the harm would have occurred anyway. *Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011).

A plaintiff may show that his protected speech was the motivating factor in the defendants' alleged retaliatory actions by presenting either direct or circumstantial evidence. *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012). Circumstantial evidence

may include suspicious timing. *Id.* While suspicious timing alone is rarely sufficient to create a triable issue, timing can give rise to an inference of causation if the plaintiff demonstrates that an adverse action followed "close on the heels of protected expression" and that "the person who decided to impose the adverse action knew of the protected conduct." *Id.* at 966. "[T]he time period between the protected activity and the adverse action must be "very close." *Id.* (quoting *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011)). "For an inference of causation to be drawn solely on the basis of a suspicious-timing argument, we typically allow no more than a few days to elapse between the protected activity and the adverse action." *Id.* "The closer two events are, the more likely that the first caused the second." *Loudermilk*, 636 F.3d at 315.

### A.     John Howard Association

Smith claims the letters he wrote to and received from the John Howard Association are protected First Amendment activity and that Defendants Butler and Hecht retaliated against him for such correspondence. In their motion for summary judgment, Defendants argue there is no evidence showing Defendants actually knew of Smith's letters and, thus, he cannot show Defendants were motivated to act by the conduct.

The Court agrees with Defendants. Even assuming that the John Howard Association letters are protected activity, Smith has failed to show that his letter writing was a motivating factor for any of the conduct Smith alleges was retaliation. Smith has provided no evidence, other than his speculation, that either Defendant Butler or Defendant Hecht was personally aware of John Howard Association letters or their

contents. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668-9 (7th Cir. 2006) (finding, in the employment context, that there must be actual knowledge of complaints or protected conduct in order to succeed on a retaliation claim); *Obriecht v. Raemisch*, No. 10-CV-221-JPS, 2013 WL 1288070, at *14 (E.D. Wis. Mar. 26, 2013), *aff'd*, 565 F. App'x 535 (7th Cir. 2014) (granting summary judgment to defendants who had no prior knowledge of the prisoner plaintiff's written complaints). There is no evidence that Defendants knew of the letters from the routine shakedowns in 2013, and Smith merely speculates that Defendants were aware of the letters since they were present for the April 2014 shakedowns. Smith's claim that he was retaliated against for his correspondence with the John Howard Association fails. *Morfin v. City of East Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003) ("The protected conduct cannot be proven to motivate retaliation if there is no evidence that the defendants knew of the protected activity.") (quotation marks and citations omitted)).

There is evidence, however, that Defendant Butler knew of Smith's *verbal* complaints to a John Howard Association representative sometime between November 9 and November 15, 2014. Smith testified that a representative from the John Howard Association visited Menard for a tour and was escorted by Warden Butler. When the John Howard Association representative visited Smith's cell, he complained about his investigative status within the presence of Warden Butler. On November 16, 2014, Smith was moved to a cell with no working toilet, no hot water, no fan, no blanket, and none of his personal electronics.

A prisoner retains his First Amendment right to freedom of expression as long as that expression is not inconsistent with his status as a prisoner and does not adversely affect the legitimate penological objectives of the prison. *Pell v. Procunier*, 417 U.S. 817, 822 (1974); *Bridges v. Gilbert*, 557 F.3d 541, 548 (7th Cir. 2009) (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987) and applying the legitimate penological interests test to determine whether an inmate alleged he engaged in protected speech). In *Bridges*, the Seventh Circuit held that while prisons have an interest in keeping the inmates as safe and secure as possible while imprisoned, "truthful speech that describes possible abuses [of that interest] can actually be quite consistent with that objective." *Bridges*, 557 F.3d at 551. Thus, a jury could find that Smith engaged in protected First Amendment activity when he spoke to the John Howard Association about his placement on investigative status. A jury could also reasonably find that Smith suffered a deprivation likely to deter a person of ordinary firmness from future First Amendment activity when he was deprived of a cell with a working toilet, hot water, and a blanket.

As for the third element, Smith relies on timing alone to show that his protected conduct was a motivating factor in Defendant Butler's alleged retaliation. Defendants do not address the timing of these events.[5] Instead, Defendants rely only on Smith's testimony that he doesn't know whether Defendant Butler was aware the cell lacked a functioning toilet or hot water *before* he was placed there. But, at the very least, the evidence indicates Defendant Butler may have known *after* Smith was placed there and

---

[5] Defendants also do not refute Smith's contention that only the Warden or Internal Affairs could authorize cell placement on the weekend.

yet Defendant Butler chose to do nothing. Furthermore, the Court finds that the timing of Smith's move to cell 718 on November 16, 2014—just days after speaking to the John Howard Association in the presence of Warden Butler—is sufficiently close in time to raise an inference of causation. Construing the evidence in the light most favorable to Smith, a reasonable jury could find that Defendant Butler either knew of the cell's conditions when Smith was placed there or that Smith alerted Defendant Butler to the conditions, yet she failed to take any corrective action out of retaliation for his communication with the John Howard Association.

Because Smith has presented sufficient evidence to meet the elements of his retaliation claim as to Defendant Butler, the burden now shifts to Defendants to demonstrate the harm would have occurred anyway. *Greene*, 660 F.3d at 979. Defendants make no argument to this end. Accordingly, Defendant Butler is not entitled to summary judgment. Whether Defendant Butler acted or failed to act in retaliation for Smith's communication with the John Howard Association is a question for a jury.

### B. Grievances

Smith's grievances are also protected First Amendment activity of which Defendants may have been aware. Viewing the evidence in the light most favorable to Smith, he submitted grievances on October 17, 2014, November 17, 2014, November 18, 2014, November 20, 2014, December 4, 2014, January 6, 2015, February 6, 2015, March 9, 2015, March 30, 2015, October 16, 2015, and December 16, 2015. Smith was put on investigative status on October 17, 2014 (before he wrote the October 17, 2014 grievance), and he was issued an allegedly defective disciplinary report on November 17, 2014. The

Adjustment Committee held its hearing on November 20, 2014. Smith was not allowed to call a witness he requested, and he was told before the hearing began that he was going to get a year in segregation. On November 24, 2014, Smith was moved into cell 628 with a thick metal door, no blanket, and no personal property; he also was denied recreation for five to six months.

Smith has not demonstrated, however, how his grievance writing was a motivating factor for these events. There is evidence Defendant Butler was aware of Smith's October 17, 2014 grievance (as resubmitted on October 24, 2014) because she responded to it. Smith also testified that he wrote other grievances and letters addressed to Defendant Butler in November 2014 and thereafter, but there is no evidence she actually received these grievances or letters. As to Defendant Hecht, even though Smith may have named her in one or more grievances, the only evidence Defendant Hecht was aware of the grievances lies in Defendant Oakley's March 3, 2015 response. In that response, Defendant Oakley stated that she contacted the "intelligence unit" of which Defendant Hecht is a part. There is no other indication that Defendant Hecht was aware of any of Smith's grievances or letters, and Menard has no record of them on file (Doc. 89, p. 8). Without any evidence of Defendants' knowledge of his grievance writing, Smith cannot show they were a motivating factor for Defendants' actions. *See Obriecht*, No. 10-CV-221-JPS, 2013 WL 1288070, at *14. And while Defendant Butler knew of the October 17, 2014 grievance, there is an insufficient temporal connection between that grievance and any alleged retaliatory actions. Thus, Smith has not met his burden in demonstrating Defendants retaliated against him for his grievance writing.

## C. Deterrence

Defendants also argue that Smith cannot show his First Amendment activity was deterred because of Defendants' conduct. Defendants point to Smith's numerous grievances submitted after the October 17, 2014 investigative report,[6] the November 17, 2014 disciplinary report, and the Adjustment Committee hearing. Smith also testified he has continued corresponding with the John Howard Association. Because Smith was not deterred from engaging in protected speech, Defendants conclude, he cannot succeed on his retaliation claim. The correct test, however, is an objective one: whether Defendants' retaliatory actions would "deter a person of ordinary firmness" from exercising First Amendment activity in the future. *Bridges*, 557 F.3d at 551. While the fact that Smith was not deterred in this case works in Defendants' favor, a reasonable juror could find that the average inmate would be deterred from filing grievances or engaging in protected speech in the future. *See Grissette v. Reed*, No. 14-CV-1478, 2016 WL 4120254, at *5 (C.D. Ill. July 28, 2016); *Collins-Bey v. Hulick*, No. 3:09-CV-00921-JPG, 2011 WL 2116456, at *3 (S.D. Ill. May 2, 2011), report and recommendation adopted, No. 09-CV-921-JPG, 2011 WL 2116450 (S.D. Ill. May 27, 2011); *Morris v. Velasco*, No. 03 C 2613, 2003 WL 21397742, at *4 (N.D. Ill. June 16, 2003) ("the sensitivities of the particular plaintiff are irrelevant"). Thus, the fact that Smith continued writing grievances and letters to the John Howard Association is not fatal to his claim.

---

[6] It is not lost on this Court that Defendants disavow receipt of these grievances, but now attempt to use Smith's grievance writing to work in their favor.

**B.    Due Process**

In Count II, Smith claims that his due process rights were violated during the November 20, 2014 disciplinary hearing. In *Wolff v. McDonnell*, the Supreme Court set out the minimal procedural protections that must be provided to a prisoner in disciplinary proceedings in which the prisoner loses good time, is confined to disciplinary segregation, or otherwise subjected to some comparable deprivation of a constitutionally protected liberty interest. *Wolff v. McDonnell*, 418 U.S. 539, 556-72 (1974); *Williams v. Ramos*, 71 F.3d 1246, 1248 (7th Cir. 1995). These include at least 24 hours' advance written notice of the charges prior to a hearing, the opportunity to call witnesses and present certain evidence, and the right to a written statement providing the basis of decision and the evidence relied upon. *Wolff*, 418 U.S. at 564.

Here, Smith was sanctioned with segregation for one year, which can implicate a liberty interest if it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). With regard to segregation, the Court should consider the length of segregation and the conditions endured. *Hardaway v. Meyerhoff*, 734 F.3d 740, 744 (7th Cir. 2013); *Marion v. Columbia Correction Inst.*, 559 F.3d 693, 697–98 (7th Cir. 2009) ("a liberty interest may arise if the length of segregated confinement is substantial and the record reveals that the conditions of confinement are unusually harsh"). If the conditions of segregation were significantly harsher than those in the normal prison environment, then a year of segregation "might count as a deprivation of liberty where a few days or even weeks might not." *Bryan v. Duckworth*, 88 F.3d 431, 433 (7th Cir. 1996), abrogated on other

grounds, *Diaz v. Duckworth*, 143 F.3d 345, 346 (7th Cir. 1998); *see also Wagner v. Hanks*, 128 F.3d 1173, 1174, 1177 (7th Cir. 1997) (vacating a dismissal on the pleadings and remanding for additional fact-finding on whether the conditions of segregation were significantly harsher than the normal prison environment with respect to a one-year term of segregation).

In this matter, Smith was sentenced to segregation for one year. This length of time is sufficient to warrant an inquiry into the conditions of that confinement. *See Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 698-89 (7th Cir. 2009). While in disciplinary segregation, Smith endured a cold and dark cell with a steel door, no blanket or coat during winter, no personal property, no fan during the summer, and no recreation for a five- to six-month period.[7] He testified that he complained about not having his blanket and other personal property afforded to other offenders upon entering segregation (Doc. 89-1, p. 104). He also testified that prisoners on general population status are allowed a blanket, fan, certain electronics, bowls, cups, and other things of that nature (*Id.* at p. 106). Smith further testified that, while normally prisoners in segregation get five hours of yard time a week, he did not get any yard time for five to six months (*Id.* at 109-10).

Based on this testimony, the conditions of Smith's confinement in segregation appear to be significantly harsher than the normal prison environment—possibly harsher than the conditions normally imposed in segregation. While the Court assumes

---

[7] While Smith was being investigated for his role in planning an attack on prison staff—and prior to his actual conviction—he was placed in segregation cells, one of which had a non-functioning toilet and no hot water. This time period will not be considered, however, because "[b]oth temporary confinement and investigative status have been determined to be discretional segregation, and do not implicate a liberty interest." *Thomas v. Ramos*, 130 F.3d 754, 761 (7th Cir. 1997) (citing *Sandin*, 515 U.S. at 486).

Smith was allowed *some* time outside his cell during that five- to six-month period, a jury may find that the combination of conditions did involve a protected liberty interest. *See Davenport v. DeRobertis*, 844 F.2d 1310, 1314-5 (7th Cir. 1988) (finding no clear error in the conclusion that "only one hour of exercise outside the cell a week and only two other hours outside the cell" is a constitutional violation); *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996) ("Lack of exercise may rise to a constitutional violation in extreme and prolonged situations where movement is denied to the point that the inmate's health is threatened."). Thus, the Court proceeds to the question of whether a reasonable jury could find that Smith's due process rights were violated during the Adjustment Committee hearing. Smith claims he requested a witness, Sanford/Stanford, but that the witness was not called at the hearing. He also claims his written and oral statements were not considered. Finally, he claims that prison regulations were violated.

At the outset, the fact that prison officials may have violated prison policies does not offend the Constitution and would not automatically lead to a finding that Smith's due process rights were violated.[8] *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006) (42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state law or departmental regulations); *Wood v. Hanks*, 49 F. App'x 638, 640 (7th Cir. 2002) (breaches of prison policy are strictly matters of state law).

---

[8] Smith claims that prison policy requires a ticket to be issued within 30 days of being placed on investigative status. Defendants deny the allegation that the ticket was defective, in conclusory fashion, because Smith was put on investigative status on October 16, 2014, and the ticket was issued on November 16, 2014. The Court observes, however, that this is actually a period of 31 days—not 30 days as it appears Defendants assume.

Second, Smith does not have an unqualified right to call as many witnesses as he wants; officials may refuse to call witnesses whose testimony would be irrelevant or unnecessary. *Ponte v. Real*, 471 U.S. 491, 495-96 (1985) (quoting *Wolff*, 418 U.S. at 566). Furthermore, Smith testified he was given an explanation as to why Sanford/Stanford was not heard: "'[a]s far as this Stanford, we got enough to find you guilty of all the charges'" (Doc. 89-1, p. 58). Thus, it is clear that prison officials found this witness to be unnecessary. *See Piggie v. Cotton*, 342 F.3d 660, 666 (7th Cir. 2003) ("Although prison disciplinary committees may deny witness requests that threaten institutional goals or are irrelevant, repetitive, or unnecessary, they may not exclude witnesses requested by an offender with no explanation at all."). Further, there is no showing of any prejudice Smith suffered as a result of Sanford/Stanford not being called.

Smith is entitled, however, to an impartial decisionmaker. *Perotti v. Marberry*, 355 F. App'x 39, 41 (7th Cir. 2009) (citing *Wolff*, 418 U.S. at 571). Smith has the right to "be confronted with the accusations against him and be afforded a reasonable opportunity to deny the accusation or explain his actions" prior to the imposition of sanctions. *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982) (quotation marks and citation omitted). In this matter, there is evidence that the opposite occurred: Smith was told he was being punished to one year of segregation, then he was allowed to present evidence and witnesses. *See e.g. Withrow v. Larkin*, 421 U.S. 35, 46-7 (1975) (noting that procedures allowing for bias or prejudgment may not be consistent with due process). As such, a jury may find that Smith's due process rights were violated. The only remaining question is by whom.

Certainly, Smith may proceed on this claim against Defendant Brookman, an adjudicator on the Adjustment Committee and the person who indicated that Smith was going to be sentenced to segregation at the very beginning of the hearing. There is no evidence, however, that any of the other Defendants were personally involved in any due process violation. *Minix v. Canarecci*, 597 F.3d 824, 833-4 (7th Cir. 2010) (liability under § 1983 requires personal involvement). Defendant Hecht was not involved in the disciplinary hearings and therefore was not personally responsible for any due process violation. Warden Butler approved the actions of the Adjustment Committee, but there is no evidence she was aware of the statements made by Defendant Brookman. *Id*. (noting that when a defendant is not "directly involved" in the alleged constitutional violation, a plaintiff must show that the defendant "condoned or acquiesced in a subordinate's unconstitutional treatment" of a plaintiff). Indeed, the report set forth the basis for the decision, which was supported by some evidence and which, on its face, comports with due process. Likewise, there is no evidence that Defendants Oakley or Greer were aware of any due process violations and simply ignored them. Smith has not shown that any of these individuals were personally involved in any due process violations that may have occurred at the disciplinary hearing.

Accordingly, Defendants Butler, Hecht, Oakley, and Greer are entitled to summary judgment on Smith's due process claim in Count II. Summary judgment shall be denied as to Defendant Brookman.

## C.    Qualified Immunity

Defendants also argue they are entitled to qualified immunity. Qualified

immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation marks and citation omitted). To determine whether Defendants are entitled to qualified immunity, the Court must consider two questions: whether "the facts that a plaintiff has alleged [ ] or shown [ ] make out a violation of a constitutional right"; and, "whether the right was clearly established at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (citations and quotation marks omitted); *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *See also Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012). With respect to the second question, the inquiry is specific to the circumstances of the case: "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. Plaintiff has the burden of establishing that a constitutional right is clearly established. *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000). While Smith need not present a "case directly on point," he must show that "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 335, 341 (1986).

Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Estate of Escobedo v. Martin*, 702 F.3d 388, 404 (7th Cir. 2012) (quotation marks and citations omitted). "If officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Defendants argue they are entitled to qualified immunity on Smith's retaliation claim because there was no constitutional violation when Smith was not deterred from his First Amendment activity. As discussed above, however, the test is whether Defendants' conduct would deter a person of ordinary firmness—not whether it actually deterred a specific plaintiff. Thus, Defendants' qualified immunity argument fails with respect to Smith's retaliation claim.

As to Smith's due process claim, Defendants summarily state they are protected by qualified immunity because Smith received the procedural protections as set forth in *Wolff*. Specifically, they say he received notice of the charges, a hearing before an impartial tribunal, the opportunity to speak in his own defense, and a written statement of the factfinders outlining the evidence presented and the basis of discipline. Defendants do not address the fact, however, that Defendant Brookman may have denied Smith the opportunity to present his case to an impartial decisionmaker when he set forth the punishment prior to conducting the hearing. It is clearly established that Smith has a right to procedural protections, including an impartial hearing, when a liberty interest is at stake. *Wolff*, 418 U.S. at 558. Because the evidence in the record, when construed in a light most favorable to Smith, indicates Defendant Brookman denied Smith the clearly established right to an impartial decisionmaker, Defendant Brookman is not entitled to qualified immunity.

## Conclusion

For the reasons set forth above, the motion for summary judgment filed by Defendants on July 27, 2017 (Doc. 88) is **GRANTED in part and DENIED in part**.

Summary Judgment is **GRANTED** in favor of Defendant Hecht and **DENIED** as to Defendant Butler on Count I. Summary Judgment is **GRANTED** in favor of Defendants Butler, Hecht, Oakley, and Greer on Count II. Summary Judgment is **DENIED** as to Defendant Brookman in Count II. Accordingly, this case shall proceed to trial on Count I against Defendant Butler and Count II against Defendant Brookman. Magistrate Judge Wilkerson is **DIRECTED** to recruit counsel for Plaintiff for trial purposes only.

     **IT IS SO ORDERED.**

     **DATED:   November 29, 2017**

                                              **_____**
                                              **NANCY J. ROSENSTENGEL**
                                              **United States District Judge**